UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

PALM ENERGY SYSTEMS, LLC                Case No.: 3:26-cv-00245

        Plaintiff,

   v.

BINANCE HOLDINGS LIMITED, d/b/a
BINANCE.COM, CHANGPENG ZHAO,
METROPOLITAN COMMERCIAL
BANK, and JPMORGAN CHASE BANK,
N.A.

        Defendants.                FEBRUARY 18, 2026

## COMPLAINT

Plaintiff Palm Energy Systems, LLC ("PES" or the "Plaintiff"), by and through its

undersigned attorneys, brings this action against Defendants Binance Holdings Limited,

Changpeng Zhao, Metropolitan Commercial Bank and JPMorgan Chase Bank, N.A. Plaintiff

alleges the following facts based upon its own knowledge, or where there is no personal

knowledge, upon the investigation of counsel and/or upon information and belief.

### I.    INTRODUCTION

1.    This case involves an intricate, fraudulent, cryptocurrency loan scheme (the "700

Capital Scheme") by which the Plaintiff, a start-up company in need of working capital, was

conned into transferring nearly $400,000.00 in Bitcoin and U.S. dollars to unidentified, foreign

scammers (the "700 Capital Scammers").  The success of the 700 Capital Scheme was directly

dependent on the complicity of Defendants Binance Holdings Limited ("Binance") and its

founder and former CEO, Changpeng Zhao ("Zhao") (collectively, the "Binance Defendants"),

who intentionally and knowingly operated their web-based cryptocurrency trading platform,

Binance.com, in violation of United States law.  The Binance Defendants' intentional flouting of

anti-money laundering and "know your customer" obligations under the Bank Secrecy Act—which were designed to prevent exactly this type of deceit —allowed the 700 Capital Scammers to launder PES's Bitcoin through Binance.com, convert to fiat currency and then abscond with the funds undetected and without a trace.  Through this action, the Plaintiff seeks to hold the Binance Defendants accountable for their starring role in facilitating the 700 Capital Scheme pursuant to the federal civil Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1964, and in violation of various state laws.  The Plaintiff seeks further recourse under the Uniform Commercial Code ("UCC"), as well as state law against Metropolitan Commercial Bank ("MCB") and JPMorgan Chase Bank ("Chase Bank")[1] based on MCB's own lapse in failing to comply with the Bank Secrecy Act's anti-money laundering and know your customer obligations, which directly assisted the 700 Capital Scammers in defrauding the Plaintiff.

## II.    PARTIES

2.      Plaintiff Palm Energy Systems, LLC ("PES") is a Delaware limited liability company with its principal place of business in Greenwich, Connecticut.

3.      Defendant Binance Holdings Limited d/b/a Binance.com ("Binance") is a foreign corporation incorporated in the Cayman Islands, but which claims to have no official company headquarters.  Since at least July 2017, Binance has operated Binance.com, the largest cryptocurrency exchange in the world.  Binance's exchange offers trading in virtual currencies, digital asset commodities and related derivatives, among other financial products and services, to over 100 million customers throughout the world, in volumes equivalent to trillions of U.S. dollars.

---

[1] As set forth in Count Twelve, the claim against Chase Bank relates solely to its status as a potential "refunding" party under the "chain of repayment" provisions required under NY UCC § 4-A-402(4).

2

4.    Defendant Changpeng Zhao ("Zhao") is a Chinese-born citizen of Canada.  Zhao is the founder and former Chief Executive Officer of Binance, who, upon information and belief, owns an estimated 90% of the company.[2]  Upon information and belief, Zhao currently resides in Dubai in the United Arab Emirates.

5.    On November 21, 2023, Binance and Zhao (collectively, the "Binance Defendants") pleaded guilty before the United States District Court for the Western District of Washington to multiple federal charges-including violations of the Bank Secrecy Act, money laundering schemes, unlicensed money transmitting, and sanctions violations.  As part of their plea deals, Binance agreed to pay $4 billion in fines, while Zhao was required to step down as CEO of the company, pay a $50 million fine, and serve a term of imprisonment.[3]

6.    Defendant Metropolitan Commercial Bank ("MCB") is a New York corporation with its principal place of business in New York, New York, that provides full service commercial banking to its customers.

7.    Defendant JPMorgan Chase Bank, N.A. ("Chase Bank"), is an American national bank that is incorporated in Ohio and headquartered in New York City, New York.

### III.    JURISDICTION AND VENUE

8.    This Court has original jurisdiction over this action pursuant to 18 U.S.C. § 1964(a) (Civil RICO jurisdiction) and 28 U.S.C. § 1331 (Federal question jurisdiction).

9.    This Court has Federal supplemental jurisdiction over the state law claims set forth herein pursuant to 28 U.S.C. § 1367.

---

[2] https://www.forbes.com/profile/changpeng-zhao/
[3] *See United States v. Binance Holdings Ltd.*, Docket No. 23-cr-178 (W.D. Wash.) (Doc. #21); *United States of America v. Changpeng Zhao*, Docket No. 23-cr-179 (W.D. Wash.) (Doc. #29).

10.    This Court also has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the parties and the matter in controversy exceeds $75,000.00

11.    This Court has personal jurisdiction over Defendants because Defendants have committed the acts and omissions giving rise to this action in this District.

12.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this District, and Defendants are subject to personal jurisdiction in this District.

IV.    **FACTUAL ALLEGATIONS**

A.    **Summary of Cryptocurrency, the Blockchain and Cryptocurrency Exchanges and the Rise of Cryptocurrency Fraud[4]**

13.    Cryptocurrency is a digital asset that exists only in electronic form, rather than as coins or bills.  Cryptocurrency relies on cryptography to facilitate and validate transfers of the electronic currency from one party to another. Bitcoin, which was first introduced in a 2008 whitepaper,[5] is generally considered the first cryptocurrency asset system to have gained widespread adoption.

14.    Transfers of cryptocurrencies are recorded on a "blockchain." The recordings are indelible, which means they cannot be deleted or altered.  For each transfer, the blockchain records the "address" – a unique series of letters and numbers—of the transferor and transferee. The blockchain thus allows cryptocurrency to be traced and tracked.

---

[4] The allegations in this section are taken and/or adapted from the Second Amended Complaint filed in *Licht, et al v. Binance Holdings Limited d/b/a Binance.com*, *et al*, Docket No. 24-cv-10447 (D. Mass.) (Doc. 79, Para. 42-44; 48-49; 63-66).

[5] Nakamoto, S. (2008). Bitcoin: A peer-to-peer electronic cash system, *available at* https://bitcoin.org/bitcoin.pdf.

15.     A user's "address" is stored in a "digital wallet." As a general matter, there are two types of "wallets" – "self-custodied wallets" and "hosted wallets." A self-custodied wallet is a wallet that the user operates and controls. Storing in a self-custodied wallet is analogous to putting cash under one's mattress or floorboard. A hosted wallet, by contrast, is owned, operated, and controlled by a centralized exchange, such as Binance.com.  Storing cryptocurrency in a hosted wallet is analogous to depositing cash into a savings account at an FDIC-insured bank.

16.     Crypto assets, such as Bitcoin, may be converted to and from a country's legal tender, or between other types of crypto assets, through a "centralized exchange" such as Binance.com. Customers of a centralized exchange can deposit crypto assets or fiat currency *(e.g.,* U.S. dollars) into their account at the exchange. The customer can then trade their deposited fiat or crypto assets for any of several other types of fiat currencies or crypto assets, transfer it to another account at the exchange, and/or withdraw it to another bank account or wallet address.

17.     A person can hold cryptocurrency indefinitely in a self-custodied wallet.  If the person wants to convert cryptocurrency to fiat currency in anonymous transactions with unrelated third parties, however, the use of a centralized exchange is necessary.

18.     Fraudulent schemes involving cryptocurrency are on the rise whereby crypto-fraud syndicates are able to engage in quick transactions with unknowing victims while maintaining anonymity outside of the highly regulated banking system.

19.     Because cryptocurrencies are built on public blockchains, cryptocurrency transactions can be tracked and traced using computer forensic analysis and readily available software. Accordingly, law enforcement generally will be able to locate and seize stolen assets from criminals and return the assets to their rightful owners so long as the crypto is not cashed

out and exchanged for fiat in a centralized exchange. Therefore, the use of a centralized exchange such as Binance, is essential to scammers in a crypto-fraud scheme in order to evade the indelibility of blockchain tracing, while still enjoying the fruits of their fraud.  Crypto scammers must launder the illicitly obtained funds on an exchange like Binance.com, where the cryptocurrency can then be converted to fiat currency and withdrawn, and by which the victims' financial losses become permanent.

20.     The ability of crypto scammers to quickly convert stolen cryptocurrency into untraceable fiat currency is dependent upon their having unfettered access to cryptocurrency exchanges with substantial liquidity. If crypto scammers are restricted from utilizing such exchanges, it is difficult if not impossible to cash out of their schemes.  Rather, the cryptocurrency assets stolen from innocent victims will eventually be tracked and traced on the blockchain, where the funds can then be seized by law enforcement. Moreover, if a cryptocurrency exchange properly flags a crypto scammer's transactions as suspicious, freezes the syndicate's account, and reports the scammer's transactions to FinCEN—as required by the Bank Secrecy Act—the crypto scammer is prevented from cashing out of its scheme, thereby allowing law enforcement to efficiently seize the stolen assets and return them to the victim.

21.     Conversely, if a cryptocurrency exchange with substantial liquidity knowingly and willfully fails to comply with its obligations under the Bank Secrecy Act and instead allows crypto scammers to use the exchange as a laundering facility and cash-out point, criminal syndicates can easily abscond with the stolen funds, leaving their victims completely unable to recover their losses.

**B.**     **PES Lost Significant Money to a Fraudulent Scheme that Utilized the Binance.com Exchange, as well as the services of MCB, as Essential Components of the Scheme**

*The 700 Capital Scheme: Background and Introduction*

22.     PES is a start-up technology firm founded in 2020 that specializes in innovation clean energy.  It aims to develop a range of aesthetically beautiful, inspirational and transformative clean energy devices that will revolutionize the way corporate campuses, retail outlets and private housing associations power themselves.

23.     In late fall of 2022, PES had progressed into the product development stage and needed funding to bring its technology to the market.  At that time, its funding requirement was $2.5 million.

24.     In early November 2022, PES's Founder and CEO, Rajiv Narain ("Narain"), reached out to an individual identified as Neil Henry ("Henry") through his account on the social networking platform, LinkedIn, to discuss a potential investment opportunity as to PES's project. Henry's LinkedIn profile stated that he was associated with 700 Capital, LLC ("700 Capital") as its Chief Marketing Officer.  700 Capital was a purported international lending company registered in Florida, which represented it had business offices in Fort Lauderdale, Florida and Stockholm, Sweden.

25.     Henry introduced PES to an individual identified as Flavio Franco ("Franco"), who was the purported Chief Financial Officer of 700 Capital.  Throughout the 700 Capital Scheme, Franco, who claimed to reside in Florida, communicated with PES via email and through the WhatsApp Messaging Platform.

26.     Franco, on behalf of 700 Capital, initially invited PES to participate in a "digital financing" program, which he explained was similar to a traditional bank loan but would use Bitcoin as the funding mechanism.  When PES told Franco that it was instead exploring an

7

investment through either a convertible note or direct subscription, he responded that 700 Capital would consider a convertible note if PES's project was based in the United States.

27.     On or about November 8, 2022, 700 Capital emailed PES a "Pre-Approval Letter" for "700 Capital Digital Investment Financing" (the "Pre-Approval Letter"). To obtain final approval, the Pre-Approval Letter noted that PES was required to provide "know your customer" or "KYC" Identity Verification.

### *Funding Agreement Setup*

28.     On or about November 16, 2022, Franco informed PES that it had been approved for Digital Private Equity Funding by 700 Capital and provided a written document entitled "Standard Settlement/Repayment Terms & Conditions" (the "Funding Agreement"). The Funding Agreement between 700 Capital and PES provided for a digital loan of $2.5 million (the "Loan Proceeds") at an interest rate of 2%, payable over five years.

29.     The Funding Agreement required PES to set up a digital account (*i.e.*, a "wallet") with 700 Capital's "preferred service provider," which it identified as "Bittor- https://bittor.io/," a supposed cryptocurrency loan platform. Once the Bittor account was opened, it was anticipated that 700 Capital would deposit the Loan Proceeds in the form of Bitcoin into the wallet. PES would then "swap" or sell the Bitcoin in exchange for U.S. dollars before requesting a transfer of the Loan Proceeds from Bittor to PES's domestic bank account at Chase Bank (the "Chase Account").

30.     Before signing the Funding Agreement, PES exchanged emails with Franco and met with him via video conferencing through which it obtained additional information regarding the terms of the Funding Agreement.

31.     On or about November 23, 2022, PES emailed Franco a signed copy of the Funding Agreement.

### *Initial Bitcoin Transfer*

32.     Thereafter, PES attempted to open a wallet at Bittor but was informed that it was first required to pay a $1,000.00 activation fee in Bitcoin.  In order to purchase Bitcoin, Franco told PES that it needed to use a third-party service provider.  On or about November 28, 2022, and in reliance on Franco's instructions, PES's Chief Financial Officer and Co-Founder, Samir Varma ("Varma"), a resident of Cos Cob, Connecticut, opened an account in his individual name, on behalf of PES, at Gemini Trust Company, LLC ("Gemini"), an American cryptocurrency exchange and custodian bank (the "Gemini Wallet").  The Gemini Wallet was a "custodial" or "hosted" wallet.  PES transferred money from its Chase Account in Greenwich, Connecticut to its Gemini Wallet, purchased $1,000.00 of Bitcoin, and then transferred the Bitcoin to its wallet at Bittor (the "Bittor Wallet").

33.     On or about December 2, 2022, Bittor notified PES that its Wallet had been successfully activated.

34.     Before receiving confirmation that its Bittor Wallet had been successfully activated, Franco assured PES that once the Loan Proceeds landed in the Bittor Wallet, the costs associated with "swapping" the Loan Proceeds from Bitcoin to U.S. dollars—*i.e*., Bittor fees, charges, etc., would be "Little (Negligible) or No charge."

35.     On December 5, 2022, Franco notified PES that 700 Capital's financing was complete and that the Loan Proceeds had been funded to PES's Bittor Wallet.

36.     Thereafter, PES attempted to swap the Loan Proceeds from Bitcoin to U.S. dollars and transfer the funds to its Chase Account.

*Multiple Fraudulent Fees Demanded from PES*

37.     On or about December 11, 2022, however, Bittor notified PES that as a "registered exchange," it was required to report all "withdrawals/cashing out" of digital currency to the IRS and that PES's attempted withdrawal "triggered the tax clearance."  Bittor informed PES that to complete the transfer of the Loan Proceeds, Bittor was required to file Form 8949 and Form 1099-B with the IRS on PES's behalf.  Bittor informed PES that there was a fee of $5,000.00 for this service.  When PES questioned Franco regarding this fee, he assured PES that it was "normal procedure."

38.     On December 23, 2022, and, in reliance on Franco's representations, PES transferred $5,000.00 in Bitcoin to Bittor from its Gemini Wallet as payment for the filing of the necessary IRS paperwork.  Bittor confirmed receipt and notified PES that it usually took two to three days to complete the withdrawal, but that PES's request may be delayed by the upcoming holiday.

39.     When the transfer of the Loan Proceeds from the Bittor Wallet to the Chase Account was still not complete by January 4, 2023, PES contacted Franco and expressed concern.

40.     Almost immediately thereafter, PES received an email from Bittor informing it that an additional fee of $46,150.00 (the "Tax Clearance Fee") was needed to obtain a purported "Tax Clearance Certificate" from the IRS before the transfer of the Loan Proceeds could be finalized.

41.     When PES told Franco that it did not have the funds to pay this undisclosed and unexpected tax payment, Franco offered to make a personal loan to PES to cover a portion of the

Tax Clearance Fee.  PES agreed to immediately repay Franco upon receipt of the Loan Proceeds to its Chase Account.

42.     Thereafter, on January 13, 2023, PES paid $28,600.00 in Bitcoin to Bittor, through its Gemini Wallet, as partial payment of the Tax Clearance Fee.  The next day, on January 14, 2023, Franco purportedly paid the balance of the Tax Clearance Fee, *i.e.*, $17,550.00, in Bitcoin to Bittor.

43.     On January 17, 2023, Bittor sent PES a copy of its purported Tax Clearance Certificate and confirmed that PES's requested transfer of the Loan Proceeds was "pending" but was expected to be completed within two days.

44.     On January 18, 2023, however, Bittor notified PES that its transfer request had been declined by Chase Bank because PES's Chase Account was not a "Digital Investment Account" ("DIA").  Bittor informed PES that its withdrawal process was done through a "Straight-Through Processing" or "STP" payment, which it stated was an automated process done purely through electronic transfers with no manual intervention.

45.     Thereafter, Franco assured PES that many big banking institutions in the United States are not configured to receive STP payments, but that he had done his research and spoken to the directors at Salvador Credit Union ("Salvador Credit") in San Salvador, El Salvador.  He informed PES that the transfer of the Loan Proceeds to its Chase Account could successfully be carried out by opening a DIA at Salvador Credit.  On January 23, 2023, Bittor also recommended that PES open a specialized DIA at Salvador Credit, which it claimed would ensure "a 100% chance of withdrawal" of the Loan Proceeds and transfer to PES's Chase Account.

*False Assurances and Bigger Demands*

46.     On or about February 1, 2023, Varma, on behalf of PES, opened a DIA at

Salvador Credit in his individual name on behalf of PES (the "Salvador DIA").

47.     Upon opening the DIA, Salvador Credit informed PES that it was required to

make a minimum initial deposit of $150,000.00 in Bitcoin to activate its DIA before PES could

perform any transactions in the account.

48.     When PES explained to Franco that it was not in a position to make such a

deposit, Franco personally offered to make the $150,000.00 deposit on PES's behalf as a short-

term loan.

49.     On or about February 2, 2023, Franco purportedly made an initial deposit of

$100,000.00 in Bitcoin to the Salvador DIA on behalf of PES.

50.     On or about February 17, 2023, Franco loaned PES an additional $48,000.00 in

U.S. dollars, which he transferred from an account at Ally Bank in Houston, Texas by wire to

Varma's personal account at Chase Bank in Greenwich, Connecticut.

51.     On February 21, 2023, PES deposited the $48,000.00 of loaned funds into its

Gemini Wallet, purchased Bitcoin, and then transferred $50,364.00 in Bitcoin to the Salvador

DIA.

52.     On February 21, 2023, Salvador Credit informed PES that the balance in its DIA

was $150,364.00, and that the Salvador DIA was now successfully activated.

53.     On or about February 22, 2023, PES received notice that Bittor had purportedly

transferred the Loan Proceeds from the Bittor Wallet to the Salvador DIA.  As of February 22,

2023, the Salvador DIA reflected a balance of $2,644,161.00.

54.     On February 23, 2023, PES attempted to initiate the transfer of the Loan Proceeds from the Salvador DIA to its Chase Account via a wire transfer.

55.     On or about February 23, 2023, however, Salvador Credit informed PES that it would first need to pay $85,965.56 to obtain a "Funds Transfer Clearance Code" (the "FTCC Fee") which was purportedly required for all international transfers as part of an anti-money laundering policy.

56.     On or about March 10, 2023, Franco informed PES that he had raised $50,000.00 towards the FTCC Fee on behalf of PES, but that PES was still short $35,000.00.

57.     On or about March 14, 2023, PES transferred $35,956.56 in Bitcoin from its Gemini Wallet to the Salvador DIA as partial payment of the FTCC Fee.

58.     On March 15, 2023, Franco informed PES that he was in fact only able to raise $42,500.00 towards the FTCC Fee, which he purportedly deposited in Bitcoin to the Salvador DIA.  Later that day, PES deposited approximately $8,000.00 in additional Bitcoin to the Salvador DIA in satisfaction of the remaining balance of the FTCC Fee.  Salvador Credit sent an email confirming that it had received PES's FTCC payment and that it was currently processing PES's "FTC code" to finalize the transaction.

59.     On March 16, 2023, Salvador Credit instructed PES to initiate the transfer of the Loan Proceeds from the Salvador DIA to its Chase Account via wire transfer.

60.     Shortly after doing so, however, Salvador Credit informed PES that its transfer request had triggered a tax condition by the Ministerio De Hacienda, El Salvador's tax authority, which required an additional payment of $58,855.00 to obtain a "tax clearance pin" (the "TCP Fee").  Salvador Credit further requested that PES submit a source of funds letter from 700 Capital to verify that the source of the funds was legitimate (the "SOF Letter").  When PES

13

questioned the TCP Fee, Salvador Credit responded that the TCP Fee was a mandatory requirement and that the funds transfer could not be completed without it.

61.     On March 17, 2023, PES provided Salvador Credit with the requested SOF Letter and asked for confirmation that upon payment of the TCP Fee, the transfer of the Loan Proceeds would be completed with no further payments due or necessary.  Salvador Credit responded by confirming that no other payments would be required to complete the transfer of the Loan Proceeds.  PES then deposited approximately $58,855.00 in Bitcoin to the Salvador DIA in satisfaction of the TCP Fee.

### *Cashier's Check Ploy*

62.     On March 20, 2023, Salvador Credit, without any prior notice or discussion, sent an email informing PES that, after reviewing the SOF Letter, it had reached a decision to close the Salvador DIA because "continuing the relationship creates possible repetitional [sic] risk to our company." No other explanation was provided.  Salvador Credit told PES that its online access to the Salvador DIA would be revoked on March 24, 2023 and that any credit balance held in the account would be returned to PES in the form of either a cashier's check or cash.

63.     Later that day, Salvador Credit informed PES that it was making arrangements to have PES's balance in its DIA disbursed to PES via a cashier's check and that a representative from Salvador Credit's legal department would reach out before the account closure date.

64.     On March 20, 2023, Karen McGuire ("McGuire"), a purported representative from Salvador Credit, Regulatory Banking Operations, reached out to PES regarding the disbursement of its available balance, which she stated was $2,791,856.00, via a cashier's check and cash letter (the "Cashier's Check").  McGuire told PES that the Cashier's Check was expected to be remitted within three business days and asked PES to provide verifiable identification, such as a passport, with which PES complied.

65.     On March 20, 2023, Salvador Credit forwarded an email to PES from a purported shipping logistics company, Cargo Pacers, which included the tracking information for the shipment of the Cashier's Check to PES.

66.     On March 21, 2023, McGuire wrote to PES and stated that she had "successfully sent out" the Cashier's Check to PES.  She noted, however, that due to the cash value of the funds transfer, there were "documentation/insurance and shipping fees" in the amount of $165,055.00 associated with delivery of the Cashier's Check that PES was required to remit to Cargo Pacers (the "Logistics Fees") before shipment.

67.     Thereafter, on March 24, 2023, PES sent approximately $171,000.00 in Bitcoin to Salvador Credit to pay the Logistics Fees to Cargo Pacers.

68.     On March 24, 2023, McGuire confirmed with PES that Salvador Credit had received the Logistics Fees and had remitted the Cashier's Check to Cargo Pacers.  She informed PES that the shipment would be sent out that evening and the Cashier's Check would be delivered to PES at Varma's personal address in Cos Cob, Connecticut, by Monday, March 27, 2023.

69.     On March 27, 2023, however, McGuire forwarded PES a shipping update from Cargo Pacers, which claimed that the Cashier's Check was currently being held at the "Customs Port of Entry" in Dallas, Texas.  Cargo Pacers stated that PES was required to pay a "custom clearance duty fee" in the amount of $74,870.00 to the U.S. Customs and Border Protection Agency ("CBP") via an Automated Clearance House ("ACH") payment (the "Customs Fee"). The shipping update stated that delivery of the Cashier's Check would be delayed until PES provided proof of payment of the Customs Fee.

70.     Cargo Pacers provided instructions for the payment of the Customs Fee as follows:

ACCOUNT NAME: Customs Border Protection Agency
BANK NAME: Metropolitan Commercial Bank
ACCOUNT NUMBER: XXXXXXXXXX9041
ACCOUNT TYPE: Checking
ROUTING NUMBER: XXXXXXXX02

71.     On March 28, 2023, PES authorized Chase Bank to make an ACH transfer of $74,870.00 (the "ACH Payment") from its Chase Account to the account at MCB purportedly held by CBP as identified by Cargo Pacers.

72.     PES provided notice of proof of payment of the Customs Fee to Cargo Pacers and Salvador Credit.  PES, however, did not receive delivery of the Cashier's Check.

73.     A short time after authorizing Chase Bank to make the ACH Payment, PES contacted MCB to express concern regarding the legitimacy of the ACH Payment.  MCB informed PES that the beneficiary account at MCB (to which the Customs Fee was paid) was a cryptocurrency depository account to which the funds had been automatically converted to cryptocurrency upon deposit into the account.

### *Realization and Unraveling of the 700 Capital Scheme*

74.     Thereafter, and despite PES's attempts to contact Salvador Credit and Cargo Pacers regarding the whereabouts of the Cashier's Check, both remained unresponsive.  While PES maintained contact with Franco—who claimed to be meeting with Salvador Credit to sort things out on PES's behalf, he too became unresponsive shortly thereafter.

75.     By late April 2023, it became apparent to PES that the Loan Proceeds did not exist and that PES had been the victim of an elaborate international crypto-fraud scheme, through which PES has suffered an out-of-pocket loss of approximately $383,000.00, while effectively destroying any opportunity to raise further capital for the continued development of its innovative technology.

76.    PES hired a forensic investigator to perform a due diligence investigation of PES's interactions with the various individuals and entities purportedly involved in the 700 Capital Scheme.

77.    The forensic investigator confirmed that the supposed individuals and organizations involved in the 700 Capital Scheme, including Henry, Franco, 700 Capital, Bittor, Salvador Credit, and Cargo Pacers, are all inter-connected and fictitious entities that are more than likely controlled by the same person(s) and who have engaged in similar crypto schemes against other victims from the United States and abroad.

78.    Specifically, the forensic investigator revealed the following:

- Identity Verification: The names "Flavio Franco" and "700 Capital" are fictitious, accompanied by stolen images of real individuals on fabricated websites.

- Network of Websites: A nexus exists between the several fabricated websites involved in the fraudulent scheme, including 700capital.se, Salvadorcredit.com, CargoPacers.com and Bittor.io, as well as to websites involved in other alleged frauds, including TFCapital.org, Blockas.com, and Bitlev.com.  These sites share similarities in registration details, domain status, source code, and server configurations.

- Email Analysis:  Using darknet intelligence operations, an email address associated with 700 Capital was identified, indicating that the person associated with the email address is based in Abidjan, Ivory Coast. The individual's information, including email usage and related accounts, suggests his involvement in the operations of 700 Capital and related entities.

- Legal and Victim Reports. Similar fraudulent experiences involving the same and/or related entities have been reported by other American and foreign victims, including a proposed federal class action complaint filed in the Northern District of California in 2023, *Gabriel v. Block Assets, LLC*, 3:23-cv-06204 (N.D. Cal.).

79.    Furthermore, the forensic investigator's blockchain analysis of the Bitcoin addresses associated with the 700 Capital Scheme, and to which PES transferred its Bitcoin, confirmed that a large portion of the stolen funds ultimately landed in wallets on the

17

Binance.com exchange, where the 700 Capital Scammers were able to launder and then convert the funds from Bitcoin into fiat currency, thereby rendering these funds untraceable and unrecoverable.

### C.    Binance and Zhao Have Admitted to Criminal Conduct that Directly Aided the 700 Capital Scheme and Contributed to Plaintiff's Injuries[6]

80.    Starting at least as early as August 2017 and continuing until at least October 2022, Binance—led by Zhao, and certain of its officers, directors, employees, and agents—knowingly failed to register with FinCEN as a money transmitting business, in violation of 18 U.S.C. § 1960, and willfully violated the Bank Secrecy Act by failing to implement and maintain an effective anti-money laundering program.

81.    Binance's violations of federal criminal law were part of a deliberate and calculated effort to profit from the United States cryptocurrency market without implementing controls required by United States law.

82.    The Binance Defendants knew that the Binance.com exchange was facilitating and aiding and abetting the crimes of crypto-fraud syndicates, including fraud schemes and money laundering that were causing financial injury to American citizens, and they intended the Binance.com exchange to operate in this fashion because it increased Binance's profits.

83.    During the August 2017 through October 2022 period, Binance operated wholly or in substantial part in the United States by serving a large number of United States users. Because of the nature of the Binance.com exchange, Binance was operating an unlicensed money transmitting business in violation of United States law. Binance operated as an unlicensed

---

[6] The allegations in this subsection are taken and/or adapted from the Second Amended Complaint in *Licht, et al v. Binance Holdings Limited d/b/a Binance.com, et al*, No. 24-cv-10447 (D. Mass.) (Doc. #79, ¶¶81-106), which itself notes that these allegations are "verbatim or near verbatim" of the respective Statement of Facts appended to the November 2023 Plea Agreements of Binance and Zhao. *See* Docket No. 23-cr-178 (Doc. #23); Docket. No. 23-cr-179 (Doc. #31).

money transmitting business in part to prevent United States regulators from discovering that Binance was facilitating billions of dollars of cryptocurrency transactions on behalf of its customers without implementing appropriate "know your customer" procedures or conducting adequate transaction monitoring.

84.     Due to Binance's willful failure to implement an effective anti-money laundering program, Binance processed transactions by users who operated illicit mixing services and were laundering proceeds of darknet market transactions, hacks, ransomware, and scams.

85.     Binance users could store and trade value in the form of virtual assets, including cryptocurrency, in accounts (or "wallets") maintained by Binance. When a user opened a Binance account, Binance assigned them a custodial virtual currency wallet—*i.e.,* a wallet in Binance's custody that allowed the user to conduct transactions on the platform, including the transferring of funds to other Binance users or accounts or to external virtual currency wallets, and the converting of cryptocurrency into fiat currency that could then be transferred into traditional bank accounts (including accounts at wholly foreign banks outside the purview of United States regulatory authorities) or otherwise withdrawn.

86.     Binance charged its users fees on every transaction that the users conducted on Binance.com. Binance thus had an economic incentive to allow, and profited from allowing, illicit transactions on the Binance.com exchange. Binance chose not to comply with United States legal and regulatory requirements, including anti-money laundering requirements, because it determined that doing so would limit the scale and speed of its revenue growth.

87.     Because Binance was operating a money transmitting business, it was required to register with FinCEN, or risk criminal penalties under 18 U.S.C. § 1960. Binance knew it was operating a money transmitting business that was required to be registered with FinCEN under

19

18 U.S.C. § 1960(a). Binance, however, chose not to register with FinCEN, meaning that it was willfully operating in violation of 18 U.S.C. § 1960(a) every single day until at least October 2022. Because Binance was in violation of 18 U.S.C. § 1960(a), every transaction that Binance conducted on the Binance.com exchange during the relevant time period—which is to say, every transaction that occurred on the Binance.com exchange during the relevant time period—also constituted a violation of 18 U.S.C. § 1956(a)(1)(A)(i) by virtue of 18 U.S.C. § 1956(c)(7)(A)'s cross-reference to 18 U.S.C. § 1961(1).

88.    Binance also failed to comply with the Bank Secrecy Act's anti-money laundering provisions, which applied to Binance because it was operating a money transmitting business. The anti-money laundering provisions that Binance flouted included provisions designed to prevent a money transmitting business from being used to facilitate money laundering and the financing of terrorist activities, as well as provisions requiring the filing of suspicious activity reports with FinCEN and monitoring for suspicious transactions. The Binance Defendants knowingly and willfully did not systematically monitor transactions on Binance's exchange, as required by the Bank Secrecy Act's anti-money laundering provisions.

89.    The Binance Defendants knew that, by not monitoring for suspicious transactions and not conducting "know your customer" diligence as required by the Bank Secrecy Act, they were facilitating and aiding and abetting criminal activity, including crypto-fraud schemes that were causing financial injury to American citizens. A Binance executive wrote to a colleague that Binance should create "a banner" stating, "[I]s washing drug money too hard these days[?] [C]ome to binance[,] we got cake for you." This was an acknowledgment that Binance was tacitly conspiring with criminals whom Binance and Zhao knew, or consciously avoided

learning, were utilizing the Binance cryptocurrency exchange as a laundering facility and cash-out point for ill-gotten proceeds stolen from fraud victims.

90.     Due to Binance's failure to implement an effective anti-money laundering program, criminal syndicates used Binance's exchange in various illicit ways, including: operating mixing services that obfuscated the source and ownership of cryptocurrency; transacting illicit proceeds from ransomware variants; and moving proceeds of darknet market transactions, exchange hacks, and various internet-related scams including "pig-butchering" schemes similar to that at issue here.

91.     The Binance Defendants knew that some of these "VIP users"—a term Binance used for customers who conducted substantial transaction volumes on the Binance.com exchange—were illicit actors or "high-risk users." In some instances, Binance and Zhao knowingly and willfully chose not to take any adverse action against such users' accounts, instead allowing these bad actors to continue to access and utilize the Binance.com exchange. In other instances, Binance engaged in sham compliance efforts, "shutting down" the users' accounts but then immediately allowing the users to open up new accounts and, incredibly, providing those users instructions on how to avoid raising red flags with their future transactions.

92.     To conceal its failure to comply with United States anti-money laundering requirements, and to conceal that it was operating an illegal money transmitting business without registering with FinCEN, Binance and Zhao formed, in or around June 2019, a new entity that they publicly called Binance.US. Binance.US was the d/b/a identity of a Delaware corporation called BAM Trading Services ("BAM"), which was at least 90% owned by Zhao. In or around June 2019, Binance.US registered with FinCEN as a money transmitting business and made at least superficial efforts to comply with the Bank Secrecy Act's anti-money laundering provisions.

Binance touted Binance.US as the cryptocurrency exchange to which U.S.-based customers would be directed. Binance did this, however, specifically and willfully to create a false and misleading impression that Binance itself was not servicing U.S.-based customers and, therefore, was not subject to United States laws including the Bank Secrecy Act. Binance, BAM, and Zhao knew, however, that the Binance.com exchange—which remained unregistered with FinCEN and was not attempting to comply (let alone actually complying) with the Bank Secrecy Act's anti-money laundering provisions—maintained a substantial United States user base.

93.    Zhao created and launched Binance.US because he knew that the Binance.US entity, indirectly controlled by Binance, would become the focus of United States law enforcement and regulatory authorities, which would allow Binance itself to continue to profit from the United States market without actually complying with United States laws. In other words, Binance.US was, at least in part, created to provide a legal and regulatory smokescreen that would distract United States regulatory and law enforcement authorities from Binance itself. In Zhao's own words, the "goal" behind Binance.US was "to make the U.S. regulatory authorities not trouble us."

94.    Binance and Zhao knew that, so long as Binance continued to have substantial business connections with the United States, Binance would be required to comply with United States registration requirements and the Bank Secrecy Act, notwithstanding the existence of Binance.US.

95.    Binance and Zhao knew that its high-volume "VIP users"—which included VIP users whom Binance and Zhao knew, or consciously avoided learning, were engaged in illicit activities and using the Binance.com exchange to launder criminal proceeds—accounted for approximately 70% of the company's transaction revenues, and it knew that approximately 30%

of those VIP users were based in the United States. After launching Binance.US, Binance executives and senior leaders, including Zhao, encouraged these VIP users—including the VIP users based in the United States—to continue to utilize the Binance.com exchange (rather than Binance.US) and to conceal and obfuscate their United States connections. During a conference call on or around June 25, 2019, Binance employees and executives told Zhao that they were contacting United States VIP users "offline" through direct phone calls so that Binance would "leave no trace." A Binance executive acknowledged that Binance's plan to retain its VIP users on the Binance platform was an "international circumvention of [Know Your Customer] rules." Nevertheless, Binance continued to take steps in furtherance of that plan, including using a "script" that Binance representatives would use with VIP users that Binance and Zhao knew were based in the United States. The script included instructions to the VIP user on how the user could conceal his United States location by, among other things, altering the IP address of the computer that the user used to log in to Binance.com.

96.     Approximately one year after Binance.US launched, Binance and Zhao knew that approximately 16% of Binance.com customers were based in the United States—more than any other country. In October 2020, Binance executives altered internal company reports to conceal this fact. Specifically, whereas company reports before October 2020 specifically identified the percentage of Binance.com customers who were based in the United States, beginning in October 2020, those same reports recategorized U.S.-based customers with the label "UNKWN."

97.     According to Binance's own transaction data, United States users conducted trillions of dollars in transactions on the Binance.com exchange between August 2017 and October 2022—transactions that generated approximately $1.6 billion in transaction fees (pure profit) for Binance.

23

98.     By concealing that the Binance.com exchange was serving a substantial percentage of U.S.-based customers, Binance illegally avoided registering with FinCEN and thereby illegally avoided complying with the Bank Secrecy Act's anti-money laundering requirements. Had Binance complied with those federal laws, Binance would have been required to conduct "know your customer" diligence on all Binance.com customers—not just those customers based in the United States. It also would have been required to monitor the Binance.com platform for suspicious transactions and to notify FinCEN of suspicious transactions. Binance did none of these things, because it knew that being hospitable and attractive to illicit actors and eschewing anti-money laundering obligations increased the size of Binance's customer base, increased Binance's transaction volume, and therefore enhanced Binance's profits and Zhao's personal fortune. Indeed, Binance never filed a suspicious activity report with FinCEN, despite knowing, consciously avoiding learning, and making themselves willfully blind to the fact that criminal syndicates were using the Binance.com exchange to facilitate their criminal schemes, specifically by using the Binance cryptocurrency exchange to launder stolen cryptocurrency assets and convert those stolen assets into fiat currency. According to FinCEN's investigatory findings, Binance's former Chief Compliance Officer reported to other Binance personnel that the senior management policy was to never report any suspicious transactions. Indeed, FinCEN found during its investigation that Binance elected to allow customers to continue to use the Binance.com exchange for transactions that a senior Binance manager described as "standard money laundering."

99.     Binance, through its conduct and willful inaction, knowingly and willfully facilitated and at least indirectly participated in the fraud schemes that utilized the Binance cryptocurrency exchange as a laundering facility and cash-out point. Moreover, to the extent

Binance and Zhao knew, consciously avoided learning, or made themselves willfully blind to the fact that certain of its customers were engaged in illicit money laundering on the Binance cryptocurrency exchange, Binance itself knowingly engaged in financial transactions in violation of 18 U.S.C. § 1956(a)(1)(A)-(B), because any financial transaction conducted through a Binance account by definition was a transaction involving Binance.

100.    As early as September 2018, Binance executives acknowledged that Binance had "[n]othing . . . in place" to review high-volume accounts for suspicious activity and that many transactions were occurring on Binance.com that "in [the] aml [anti-money laundering] world" would be flagged for money laundering risks. Zhao, however, said that he did not "see a need to" comply with anti-money laundering rules and that it was "better to ask for forgiveness than permission." Zhao, and therefore Binance, believed that subjecting Binance's customers to a "know your customer" process compliant with United States law, monitoring transactions for suspicious activity as required by the Bank Secrecy Act, and reporting suspicious transactions to FinCEN as required by the Bank Secrecy Act, would mean that some customers would choose not to use Binance and that others would be rejected or flagged by the compliance process, both of which would interfere with Binance's efforts to gain market share and increase its profits. This led one member of Binance's so-called compliance department to write, "[W]e need a banner '[I]s washing drug money too hard these days[?] [C]ome to binance[,] we got cake for you.'" This compliance employee's statement was essentially an admission that a natural and foreseeable consequence of Binance's flagrant violation of 18 U.S.C. § 1960(a) and the concomitant requirement to comply with the Bank Secrecy Act's anti-money laundering provisions was that Binance was inviting criminals to use the exchange as a laundering facility and cash-out point for its illicit cryptocurrency proceeds.

101.    Brian Shroder became the CEO of Binance.US in August 2021. Although Zhao in fact controlled and directed BAM's and Binance.US's conduct, including BAM's efforts to mislead United States regulators and law enforcement regarding Binance's clandestine exploitation of the United States trading market in violation of 18 U.S.C. § 1960(a), Shroder agreed with Zhao that BAM should participate in and conspire with Binance's and Zhao's criminal scheme. Shroder was aware, at the time that he became the Binance.US CEO, that Binance was continuing to operate in the United States market illegally, in violation of 18 U.S.C. § 1960. Shroder, however, agreed with Zhao that BAM would maintain the public-facing position that all U.S.-based customers were restricted to using the Binance.US exchange, which had registered with FinCEN and was endeavoring to comply with United States anti-money laundering laws. Shroder knew that this public-facing position was false. Shroder also continued to publicly tout that Binance.US was "regulatorily compliant," despite knowing that Binance.US in fact was intended by Zhao to be a smokescreen to distract United States regulatory agencies and law enforcement from the fact that Binance itself was still substantially operating in the United States market and dependent on U.S.- based market makers for daily trading liquidity without registering with FinCEN or complying with the Bank Secrecy Act's anti-money laundering requirements, in violation of 18 U.S.C. § 1960(a) and the Bank Secrecy Act.

102.    As the Second Circuit Court of Appeals recently affirmed, Binance in fact "has a substantial presence" in the United States, "with servers, employees, and customers throughout the country." *Williams v. Binance*, 96 F.4th 129, 133 (2d Cir. 2024). And as the United States put it in the sentencing memorandum it filed on April 23, 2024, in Zhao's criminal prosecution, Zhao and Binance "violated U.S. law on an unprecedented scale" and "massively profited from the U.S. financial system, U.S. businesses, and U.S. customers— all without playing by U.S. rules"

and "with deliberate disregard for the company's legal responsibilities and for its capacity to cause significant harm."[7]

103.    In its November 2023 criminal plea, Binance admitted that its conduct as set forth above constituted a conspiracy to violate the Bank Secrecy Act's anti-money laundering requirements and 18 U.S.C. § 1960(a)'s prohibition on operating an unregistered money transmitting business. Binance's plea to violating 18 U.S.C. § 1960(a) is necessarily an admission that every financial transaction that it conducted on the Binance.com exchange (*i.e.,* all of the financial transactions that occurred on the Binance.com exchange) were violations of 18 U.S.C. § 1956(a)(1)(A)(i) by virtue of 18 U.S.C. § 1956(c)(7)(A)'s cross-reference to 18 U.S.C. § 1961(1).

104.    The Commodity Futures Trading Commission ("CFTC") also filed a complaint against Binance and Zhao in the Northern District of Illinois in March 2023.[8]  As relevant to the scheme alleged herein, the CFTC made clear in its complaint that Binance's business model was predicated on money laundering and targeting U.S.-based customers to use the exchange.  In November 2023, the action was resolved via a Consent Order with the Court finding that Zhao and Binance violated the Commodity Exchange Act (CEA) and CFTC regulations, imposing a $150 million civil monetary penalty personally against Zhao, and requiring Binance to disgorge $1.35 billion of ill-gotten transaction fees and pay a $1.35 billion penalty to the CFTC. The Consent Order also obligated Zhao and Binance to make certifications as to the existence, application, and efficacy of Binance's improved compliance controls, and permanently enjoined them from further violations as charged.

---

[7] *See* 23-cr-179 (Doc. #78, p. 4).
[8] *See Commodity Futures Trading Commission v. Zhao, et al*, 23-CV-01887 (N.D. Ill.)

105.    In sum, the Binance Defendants' knowing and willful conduct so egregiously and systematically assisted crypto-fraud syndicates that, in addition to constituting the RICO predicate offenses to which Binance pled guilty and to which Zhao essentially admitted in his own criminal plea, it also constitutes aiding and abetting of the wire frauds that criminal syndicates, including the 700 Capital Scammers, were committing against United States citizens as well as the money laundering that those syndicates had to commit in order to successfully complete their wire frauds.

106.    Notwithstanding Zhao and Binance's guilty pleas and their commitment to strengthening Binance's compliance controls and transaction monitoring, Binance has, upon information and belief, continued to allow suspicious accounts to operate on the Binance.com exchange without restriction.[9]

## V.  THE BINANCE DEFENDANTS' CIVIL RICO LIABILITY FOR THE PLAINTIFF'S ECONOMIC INJURIES

### A.  The RICO Enterprises

107.    Plaintiff hereby realleges and incorporates by reference the allegations in Paragraphs 1 through 106 above.

108.    The facts alleged in this complaint establish at least one association-in-fact RICO enterprise and one corporate RICO enterprise, which are described as follows:

**Association-in-Fact Enterprise ("Enterprise #1")**

109.    Zhao and the individual employees, officers, and executives of Binance (collectively "Enterprise #1 Members") constitute an association-in-fact RICO enterprise ("Enterprise #1").  The common purpose of Enterprise #1 was to knowingly and intentionally:

---

[9] McCrum, Dan, et al, "Binance allowed suspicious accounts to operate even after 2023 US plea agreement." Financial Times (December 22, 2025).

(1) operate Binance as an unlicensed money transmitting business in violation of 18 U.S.C. §1960(a); (2) to allow Binance to facilitate and conduct transactions on Binance.com that the Enterprise #1 Members knew involved illicit proceeds derived from criminal offenses in violation of 18 U.S.C. §1956(a); and (3) to allow Binance to operate in such a manner as to aid and abet crypto-fraud syndicates in their fraudulent schemes that victimized innocent American citizens through wire fraud, including PES here, and that used the Binance.com exchange as a money laundering facility to cash out the illicit proceeds, thereby rendering such proceeds untraceable and unrecoverable.  In exchange, Binance and Zhao received payouts from the illicit transactions conducted by crypto-fraud syndicates on Binance.com.  The Enterprise #1 Members participated in and conducted the affairs of Enterprise #1 through a pattern of racketeering activity.  The longevity of this scheme was sufficient to pursue and fulfill the purpose of Enterprise #1.

**Binance Corporate Enterprise ("Enterprise #2")**

110.    Zhao and his Binance employees, officers, and executives conspired to operate Binance: (1) as an illegal money transmitting business in violation of 18 U.S.C. §1960(a); and (2) in such a manner as to aid, abet, and facilitate crypto-fraud syndicates in their fraudulent schemes that involved wire fraud and money laundering.  Binance itself is therefore a corporate RICO enterprise, for whose conduct Zhao can be held responsible as the RICO defendant. The Binance Corporate RICO Enterprise is referred to herein as Enterprise #2.  Zhao, as the then-CEO of Binance, is responsible and individually liable for directing Enterprise #2 to operate through a pattern of racketeering activity.  The longevity of this scheme was sufficient to pursue and fulfill the purpose of Enterprise #2.

**Association-in-Fact Enterprise ("Enterprise #3")**

111.     Binance, Zhao and the 700 Capital Scammers and any other persona or identity related to the 700 Capital Scammers, who fraudulently induced wire payments from PES (collectively the "Enterprise #3 Members"), constitute an association-in-fact RICO enterprise ("Enterprise #3"). The common purpose of Enterprise #3 was to defraud innocent victims of cryptocurrency through intricate and ongoing wire fraud and to use the Binance.com exchange to launder the illicitly obtained funds, and, to operate in a manner as to aid, abet and facilitate the wire frauds and money laundering of the 700 Capital Scheme. In exchange, Zhao and Binance received transaction fees from the 700 Capital Scammers each time they used Binance.com to exchange fraudulently obtained funds for untraceable funds.  Binance and Zhao participated in Enterprise #3's activities through a pattern of racketeering activity.  Binance and Zhao provided Enterprise #3 the means to commit money laundering and to cash-out their illicit "earnings" through Binance.com.  The longevity of this scheme was sufficient to pursue and fulfill the purpose of Enterprise #3.

**Association-in-Fact Enterprise ("Enterprise #4")**

112.     The 700 Capital Scammers and any other persona or identity related to the 700 Capital Scammers, who fraudulently induced wire payments from PES (collectively the "Enterprise #4 Members"), constitute a discrete association-in-fact RICO enterprise ("Enterprise #4").  Enterprise #4 engaged in an open-ended pattern of racketeering activity whose common purpose was to defraud innocent victims of cryptocurrency, including PES, and to then launder those funds on centralized cryptocurrency exchanges that were known to be permissive toward such illegal activities, such as Binance.com.  Binance and Zhao conspired with Enterprise #4 to violate 18 U.S.C. § 1962(c) as they agreed to facilitate Enterprise #4's wire frauds and money

laundering by permitting Enterprise #4 to use the Binance.com exchange to launder and cash-out its stolen funds, thereby rendering the funds untraceable and unrecoverable. The longevity of this scheme was sufficient to pursue and fulfill the purpose of Enterprise #4.

### B. The RICO Enterprises' Patterns of Racketeering Activity

113.    Plaintiff hereby realleges and incorporates by reference the allegations in Paragraphs 1 through 112 above.

### Enterprise #1 and #2's Racketeering Activity

114.    Zhao, as the then-CEO of Binance, was associated with and directed the conduct of Enterprise #1 and Enterprise #2 through a pattern of racketeering activity. This pattern included: (1) operating Binance as an unregistered and unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a); and (2) aiding and abetting the wire frauds and money laundering of crypto-fraud syndicates, in violation of 18 U.S.C. §§ 1343 and 1956(a), respectively, whom Binance and Zhao knowingly allowed to use the Binance.com exchange in furtherance of their fraudulent schemes..

115.    Enterprise #1 and Enterprise #2 and their patterns of racketeering activity began in or around July 2017, when Zhao launched Binance, and lasted at least through March 2023.

### Enterprise #3's Racketeering Activity

116.    Zhao was associated with and participated in the conduct of Enterprise #3 through a pattern of racketeering activity, including (1) aiding and abetting crypto-fraud syndicates' wire fraud against U.S.-based victims in violation of 18 U.S.C. § 1343; and (2) aiding abetting the laundering of such illicit proceeds on the Binance.com exchange in violation of 18 U.S.C. § 1956(a),.

117.    Enterprise #3's pattern of racketeering activity began on or around November 2022 and lasted at least through at least March 2023.

<strong>Enterprise #4's Racketeering Activity</strong>

118.    The people behind, in charge of, and in control of the Enterprise #4 Members participated in and directed Enterprise #4's scheme through a pattern of racketeering activity, including: (1) using international wire communications to defraud U.S.-based victims, including PES, out of significant sums of U.S. dollars and cryptocurrency in violation of 18 U.S.C §1343; and (2) laundering those illicitly obtained funds through the Binance.com exchange in violation of 18 U.S.C. § 1956(a)(1)(A).

119.    Enterprise #4 and its pattern of racketeering activity began in or around November 2022 and lasted at least through March 2023.

## C. The Causal Connection Between the RICO Enterprises' Racketeering and PES's Economic Injuries

120.    Plaintiff hereby realleges and incorporates by reference the allegations in Paragraphs 1 through 119 above.

121.    Enterprises #1, #2, #3, and #4's racketeering activities were the but-for and proximate causes of PES's economic injuries.

122.    Enterprise #1's and Enterprise #2's racketeering activities were a but-for and proximate cause of PES's economic injuries.  First, by allowing Binance to operate as an unlicensed money transmitting business in violation of 18 U.S.C. § 1960(a), Enterprise #1 and Enterprise #2 permitted Binance to circumvent the Bank Secrecy Act's anti-money laundering requirements, including its intentional failure to employ an effective anti-money laundering program. Its failure to do so directly resulted in Binance.com being used as a money laundering facility by crypto-fraud syndicates. But-for Binance's intentional enabling of unregulated

transactions, the 700 Capital Scammers would not have been able to successfully launder PES's funds on Binance.com. Rather, pursuant to an effective anti-money laundering program, Binance would have frozen the scammers' accounts, thereby allowing law enforcement to trace and return the stolen funds to PES. Second, because Enterprise #1 and Enterprise #2 aided and abetted the wire frauds and subsequent laundering of the stolen funds by crypto-fraud syndicates in violation of 18 U.S.C. § 1343 and 18 U.S.C. § 1956(a), Enterprise #1 and Enterprise #2 are charged as having committed those wire frauds and money laundering activities in their own right. These racketeering acts were a but-for and proximate cause of PES's economic injuries, because the wire frauds were the means by which PES's funds were stolen and the laundering of those funds on the Binance.com exchange is what caused the funds to become untraceable and unrecoverable by law enforcement

123.     Enterprise #3's racketeering activities were a but-for and proximate cause of PES's economic injuries. Enterprise #3's racketeering activities included: (1) the criminal syndicates' underlying wire frauds that caused injury to PES; and (2) the subsequent laundering of the illicit funds obtained through the wire fraud on Binance.com, which rendered PES's economic losses permanent. These racketeering acts were a but-for and proximate cause of PES's economic injuries, because the wire frauds were the means by which PES's funds were stolen and the laundering of those funds on the Binance.com exchange is what caused the funds to become untraceable and unrecoverable by law enforcement. By aiding and abetting those wire frauds and money laundering activities, Binance and Zhao are charged as having committed those wire frauds and money laundering activities in their own right.

124.     Enterprise #4's racketeering activities were a but-for and proximate cause of PES's economic injuries. Enterprise #4's racketeering activities included: (1) the wire fraud of

33

the crypto-fraud syndicates against U.S.-based victims, including PES; and (2) the money laundering of those illicit funds on Binance.com, which rendered PES's losses permanent.  These racketeering acts were a but-for and proximate cause of the PES's economic injuries, because the wire frauds were the means by which PES's funds were stolen and the laundering of those funds on the Binance.com exchange is what caused the funds to become untraceable and unrecoverable by law enforcement.  By conspiring with Enterprise #4 to facilitate Enterprise #4's wire frauds and money laundering activities, Binance and Zhao are liable for the economic injuries that Enterprise #4 caused PES, and Binance and Zhao's conspiratorial conduct enabled Enterprise #4 to succeed.

### COUNT ONE
### (Defendant Zhao)
### (18 U.S.C. § 1964(c), for violations of 18 U.S.C. § 1962(c))

125.    The Plaintiff hereby realleges and incorporates by reference the allegations in Paragraphs 1 through 124 above.

126.    Zhao was associated with Enterprises #1 and participated in and/or directed the conduct of Enterprise #1's schemes through a pattern of racketeering activity as described above, including directing Enterprise #1 to aid and abet the wire frauds and money laundering of crypto-fraud syndicates that Zhao knew were using Binance.com for such criminal purposes.

127.    Enterprise #1's racketeering activities, as directed and conducted by Zhao, were a but-for and proximate cause of the Plaintiff's economic injuries for the reasons described above.

### COUNT TWO
### (Defendant Zhao)
### (18 U.S.C. § 1964(c), for violations of 18 U.S.C. § 1962(c))

128.    The Plaintiff hereby realleges and incorporates by reference the allegations in Paragraphs 1 through 124 above.

129.     Zhao, as the then-CEO of Binance, was associated with Enterprise #2 and participated in and/or directed the conduct of Enterprise #2's schemes through a pattern of racketeering activity as described above, including by directing Enterprise #2 to aid and abet the wire frauds and money laundering of crypto-fraud syndicates that Zhao knew were using Binance.com for such criminal purposes.

130.     Enterprise #2's racketeering activities, as directed and conducted by Zhao, were a but-for and proximate cause of the Plaintiff's economic injuries for the reasons described above.

## COUNT THREE
### (Defendants Binance and Zhao)
### (18 U.S.C. § 1964(c), for violations of 18 U.S.C. § 1962(c)))

131.     The Plaintiff hereby realleges and incorporates by reference the allegations in Paragraphs 1 through 124 above.

132.     Binance and Zhao were each associated with Enterprise #3 and knowingly and intentionally participated in and/or directed the conduct of Enterprise #3's schemes through a pattern of racketeering activity as described above, including by aiding and abetting the wire frauds and money laundering of crypto-fraud syndicates that Zhao and Binance knew were using Binance.com for such criminal purposes.

133.     Enterprise #3's racketeering activities, as directed and conducted by Binance and Zhao, were a but-for and proximate cause of the Plaintiff's economic injuries for the reasons described above.

## COUNT FOUR
### (Defendants Binance and Zhao)
### (18 U.S.C. § 1964(c), for violations of 18 U.S.C. § 1962(d))

134.     The Plaintiff hereby realleges and incorporates by reference the allegations in Paragraphs 1 through 124 above.

135.    Binance and Zhao conspired with Enterprise #4 and its pattern of racketeering activity, as described above.  Zhao and Binance conspired with Enterprise #4 to violate 18 U.S.C. § 1962(c), as described above.

136.    Enterprise #4's racketeering activities were a but-for and proximate cause of the Plaintiff's economic injuries for the reasons described above.

137.    As Binance and Zhao conspired with Enterprise #4 and its racketeering activities, such as their conspiracy with Enterprise #4 to violate 18 U.S.C. § 1962(c), Zhao and Binance are liable for the economic injuries that Enterprise #4's racketeering activities caused the Plaintiff for the reasons described above.

## COUNT FIVE
## AIDING AND ABETTING COMMON LAW FRAUD
### (Against Binance and Zhao)

138.    The Plaintiff hereby realleges and incorporates by reference the allegations in Paragraphs 1 through 106 above.

139.    It is undisputed that the Plaintiff was defrauded and suffered financial harm by the unknown and unidentified perpetrators in connection with the 700 Capital Scheme.

140.    Binance and Zhao were aware that by intentionally failing to comply with anti-money Laundering and "know your customer" obligations under United States law, the Binance.com platform was being used as a breeding ground for the facilitation of criminal activity.

141.    Binance and Zhao knowingly and substantially assisted the perpetrators in the 700 Capital Scheme for which the Plaintiff has suffered damages.

## COUNT SIX
## AIDING AND ABETTING CONVERSION
### (Against Binance and Zhao)

142.    The Plaintiff hereby realleges and incorporates by reference the allegations in Paragraphs 1 through 106 above.

143.    The unknown and unidentified perpetrators of the 700 Capital Scheme, without authorization, assumed and exercised ownership over the funds belonging to the Plaintiff and to the permanent exclusion of the Plaintiff, which constitutes common law conversion.

144.    Binance and Zhao were aware that by intentionally failing to comply with anti-money laundering and "know your customer" obligations under United States law, the Binance.com platform was being used as a breeding ground for the facilitation of criminal activity and the theft of funds such as that suffered by the Plaintiff.

145.    Binance and Zhao knowingly and substantially assisted the perpetrators in the 700 Capital Scheme in assuming and exercising ownership of the Plaintiff's funds, without authorization, to the permanent exclusion of the Plaintiff.

## COUNT SEVEN
## VIOLATION OF CONNECTICUT UNFAIR TRADE
## PRACTICES ACT ("CUTPA"), CONN.GEN. STAT. §§42-110a, *et seq.*
### (Against Binance)

146.    The Plaintiff hereby realleges and incorporates by reference the allegations in Paragraphs 1 through 106 above.

147.    The acts of the Binance Defendants set forth above offend public policy, constitute immoral, unethical, oppressive and unscrupulous conduct in the conduct of trade or commerce, and caused substantial injury to consumers.

148.    By virtue of this conduct, Binance has violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§42-110a, *et seq.*

149.    As a result of the foregoing, the Plaintiff has suffered ascertainable loss of money or property.

150.    A copy of this Complaint will be mailed to the Attorney General of the State of Connecticut and to the Commissioner of Consumer Protection of the State of Connecticut pursuant to Conn. Gen. Stat. §42-110g(c).

**COUNT EIGHT**
**AIDING AND ABETTING FRAUD**
**(Against MCB)**

151.    The Plaintiff hereby realleges and incorporates by reference the allegations in Paragraphs 1 through 106 above.

152.    It is undisputed that the Plaintiff was defrauded and suffered financial harm by the 700 Capital Scammers, who utilized the MCB Account in furtherance of the 700 Capital Scheme.

153.    The Bank Secrecy Act requires MCB, as a regulated financial institution, to establish, implement, and maintain an effective anti-money laundering program.

154.    Upon information and belief, MCB failed to fully comply with its regulatory duties to institute and/or employ a robust Know Your Customer program, including a Customer Identification Program, to monitor the 700 Capital Scammer's account activity, and/or to investigate suspicious activity in the 700 Scammer's account.

155.    By intentionally failing to abide by its anti-money laundering and Know Your Customer duties, MCB knew that its services were being used for the facilitation of financial fraud.

156.    MCB knowingly and substantially assisted the perpetrators in the 700 Capital Scheme for which the Plaintiff has suffered damages.

## COUNT NINE
## AIDING AND ABETTING CONVERSION
### (Against MCB)

157.    The Plaintiff hereby realleges and incorporates by reference the allegations in Paragraphs 1 through 106 above.

158.    Through the MCB Account, the unknown and unidentified perpetrators of the 700 Capital Scheme, without authorization, assumed and exercised ownership over funds belonging to the Plaintiff and to the permanent exclusion of the Plaintiff, which constitutes common law conversion.

159.    The Bank Secrecy Act requires MCB, as a regulated financial institution, to establish, implement, and maintain an effective anti-money laundering program.

160.    Upon information and belief, MCB failed to fully comply with its regulatory duties to institute and/or employ a robust Know Your Customer program, including a Customer Identification Program, to monitor the 700 Capital Scammer's account activity, and/or to investigate suspicious activity in the 700 Scammer's account.

161.    MCB was aware that by intentionally failing to comply with its anti-money laundering and Know Your Customer obligations under the Bank Secrecy Act, its services were being used for the facilitation of financial fraud and the theft of funds such as that suffered by the Plaintiff.

162.    MCB knowingly and substantially assisted the perpetrators in the 700 Capital Scheme in assuming and exercising ownership of the Plaintiff's funds, without authorization, to the permanent exclusion of the Plaintiff.

**COUNT TEN**
**VIOLATION OF CONNECTICUT UNFAIR TRADE**
**PRACTICES ACT ("CUTPA"), CONN. GEN. STAT. §§42-110a, *et seq*.**
**(Against MCB)**

163.    The Plaintiff hereby realleges and incorporates by reference the allegations in

Paragraphs 1 through 106 and Paragraphs 153-156 of Count Eight above.

164.    The acts of MCB set forth above offend public policy, constitute immoral,

unethical, oppressive and unscrupulous conduct in the conduct of trade or commerce, and caused

substantial injury to consumers.

165.    By virtue of this conduct, MCB has violated the Connecticut Unfair Trade

Practices Act, Conn. Gen. Stat. §§42-110a, *et seq*.

166.    As a result of the foregoing, the Plaintiff has suffered ascertainable loss of money

or property.

167.    A copy of this Complaint will be mailed to the Attorney General of the State of

Connecticut and to the Commissioner of Consumer Protection of the State of Connecticut

pursuant to Conn. Gen. Stat. §42-110g(c).

**COUNT ELEVEN**
**REQUEST FOR DECLARATORY JUDGMENT THAT MCB**
**COULD NOT ACCEPT PES'S ACH PAYMENT UNDER**
**NY UCC § 4-A-207**
**(Against MCB)**

168.    The Plaintiff hereby realleges and incorporates by reference the allegations in

Paragraphs 1 through 106 above.

169.    On March 27, 2023, Cargo Pacers instructed the Plaintiff to transfer $74,870.00

by an ACH transfer to MCB Account, with a beneficiary identified as the United States Customs

and Border Protection Agency.

170.    On March 28, 2023, the Plaintiff instructed Chase Bank to transfer $74,870.00 from the Plaintiff's Chase Account to the MCB Account and to the named beneficiary as instructed by Cargo Pacers.

171.    On or about March 28, 2023, MCB took custody of the $74,870.00 ACH Payment, which identified the MCB Account and the United States Customs and Border Protection Agency as the intended beneficiary.

172.    On or about March 28, 2023, MCB transferred the funds to the MCB Account.

173.    In fact, however, the MCB Account was not owned by the United States Customs and Border Protection Agency but was instead controlled by the 700 Capital Scammers and used in furtherance of the 700 Capital Scheme.

174.    MCB processed the ACH Payment even though the beneficiary identified as the "U.S. Customs and Border Protection"—a federal government agency—did not match the actual name associated with the MCB Account.

175.    MCB, having opened the MCB Account, had actual knowledge of the information contained in its own records at the time of the ACH Payment and knew that the MCB Account was not owned by, nor did it have any association with the United States Customs and Border Protection Agency.

176.    Therefore, no person had rights as a beneficiary to the $74,870.00 ACH Payment and effective acceptance by MCB could not occur under NY UCC § 4-A-207(2)(b).

## COUNT TWELVE
### VIOLATION OF NY UCC § 4-A-207
### ENTITLING PES TO REFUND OF THE ACH PAYMENT
### (Against Chase Bank)

177.    The Plaintiff hereby realleges and incorporates by reference the allegations in Paragraphs 1 through 106 and Paragraphs 169-176 of Count Eleven above.

41

178.    As stated above, MCB's acceptance of the ACH Payment in the amount of
$74,870.00 was not effective under NY UCC § 4-A-207(2)(b) because MCB had actual
knowledge that the MCB Account did not match the beneficiary designated with the ACH
Payment.  Therefore, there was no effective acceptance of the ACH Payment.

179.    Accordingly, Chase's obligation to pay said order was excused under NY UCC §
4-A-402(3).

180.    Under the "Chain of Repayment" provisions in NY UCC § 4-A-402(4), Chase
must refund the $74,870.00 payment it received from the Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for the following relief:

*As to the Binance Defendants:*

1.      An order holding that the Binance Defendants are jointly and severally liable for the financial injuries the Plaintiff suffered as a result of either the racketeering acts that the Binance Defendants committed and/or that they aided and abetted;

2.      An order trebling the damages for which the Binance Defendants are liable under RICO;

3.      An award of statutory attorney's fees and costs;

4.      An order holding that the Binance Defendants are jointly and severally liable for aiding and abetting the fraud and/or conversion of the 700 Capital Scammers for which the Plaintiff has suffered damages;

5.      An order holding that Binance is liable for a violation of CUTPA, Conn. Gen. Stat. §§42-110a, *et seq*., entitling the Plaintiff to an award of attorney's fees and punitive damages under §§42-110g(a) and (d); and;

6.      Any other relief that the court deems just and proper.

*As to Defendant MCB*:

7.      An order holding that MCB is liable for aiding and abetting the fraud and conversion of the 700 Capital Scammers for which the Plaintiff has suffered damages;

8.      An order holding that MCB is liable for a violation of CUTPA, Conn. Gen. Stat. §§42-110a, *et seq*., entitling the Plaintiff to an award of attorney's fees and punitive damages under §§42-110g(a) and (d); and

9.      A declaratory judgment that effective acceptance of the ACH Payment by MCB did not occur under NY UCC § 4-A-207(2)(b); and

43

*As to Defendant Chase Bank*:

      10.    An order that the Plaintiff is entitled to a refund from Chase Bank under NY UCC

§ 4-A-402(4) in the amount of $74,870.00.

                                                          **PLAINTIFF**
                                                          **PALM ENERGY SYSTEMS, LLC**

                      By: *&#95;/s/Ari J. Hoffman&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;&#95;*
                         Ari J. Hoffman, Esq.
                         Federal Bar No. ct22516
                         Janna D. Eastwood
                         Federal Bar No. ct26522
                         Cohen and Wolf, P.C.
                         1115 Broad Street
                         Bridgeport, CT  06604
                         Tele:  (203) 337-4255
                         Fax:   (203) 394-9901
                        E-mail: ahoffman@cohenandwolf.com
                                          jeastwood@cohenandwolf.com